## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 17 2019, 9:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John R. Worman
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of J.O. (a minor child); | July 17, 2019 |
| J.O. (Father), | Court of Appeals Case No. 19A-JT-48 |
| *Appellant-Respondent,* | Appeal from the Vanderburgh Superior Court |
| v. | The Honorable Brett J. Niemeier, Judge |
| The Indiana Department of Child Services, | Trial Court Cause No. 82D04-1807-JT-1389 |
| *Appellee-Petitioner.* | |

**Pyle, Judge.**

# Statement of the Case

[1] J.O. ("Father") appeals the termination of the parent-child relationship with his son, J.O. ("J.O.").[1] He contends that Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in J.O.'s removal or the reasons for placement outside Father's home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to the J.O.'s well-being; and (3) termination of the parent-child relationship is in J.O.'s best interests. Concluding that there is sufficient evidence to support the trial court's termination of the parent-child relationship, we affirm the trial court's judgment.[2]

[2] We affirm.

---

[1] J.O.'s mother ("Mother") is not a party to this appeal.

[2] Father also argues that he was "denied due process when DCS failed to comply with state law requiring it to move to dismiss a termination petition when it failed to provide necessary services." (Father's Br. at 12.). In support of his argument, Father directs us to INDIANA CODE § 31-35-2-4.5, which provides that "[a] person described in section 4(a) of this chapter *may* file a motion to dismiss the petition to terminate the parent-child relationship if any of the following circumstances apply[.]" (emphasis added). First, Father has waived appellate review of this issue because he failed to raise it at the termination hearing. *See Hite v. Vanderburgh Cnty OFC*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006) (explaining that it is "well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal.") Waiver notwithstanding, we find no error. The interpretation of a statutory scheme is a question of law reserved for the courts. *G.E. v. Ind. Dep't of Child Servs.*, 29 N.E.3d 769, 771 (Ind. Ct. App. 2015). When determining the legislature's intent, we look at the plain language of the statute and attribute the common, ordinary meaning to terms found in everyday speech. *Id.* If the word "shall" is used, it is constructed as mandatory language creating a statutory right to a particular outcome after certain conditions are met. *Id.* However, the term "may" in a statute ordinarily implies a permissive condition and a grant of discretion. *Id.* Here, the plain language of the statute reveals that filing a motion to dismiss the petition is permissive and is discretionary rather than required. Father's argument therefore fails.

# Issue

Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

The evidence and reasonable inferences that support the judgment reveal that Father was incarcerated when J.O. was born in December 2012. Father was released from prison in early 2013. In May 2013, the State charged Father with dealing methamphetamine, unlawful possession of a syringe, and resisting law enforcement. In August 2013, Father pled guilty to all three charges. Shortly after his 2014 release from prison on those convictions, Father punched his girlfriend in the face and was charged with armed robbery, battery with a deadly weapon, and theft. Father subsequently pled guilty to the theft charge in September 2014.

In November 2014, Father and Mother were involved in one of their frequent domestic disputes when Mother sustained numerous facial fractures after Father punched her in the face. As a result of the domestic violence, DCS removed J.O. from his parents that same month and filed a petition alleging that J.O. was a Child in Need of Services ("CHINS"). The State charged Father with battery with moderate bodily injury and battery resulting in serious bodily injury in December 2014.

Following J.O.'s removal, Father was admitted to a substance abuse treatment program at Brentwood Meadows ("Brentwood") in December 2014. At the

time of his admission, Father tested positive for methamphetamine, THC, and benzodiazepines and admitted that he had been using K2 for years. In January 2015, the State charged Father with auto theft and theft. His resulting incarceration caused him to miss multiple treatment appointments at Brentwood, and he was discharged from the program that same month. He subsequently completed the program in February 2015.

[6] Also in February 2015, J.O was adjudicated to be a CHINS. The following month, the trial court ordered Father to: comply with random drug screens; obtain a substance abuse evaluation and follow treatment recommendations; remain drug free; and attend supervised visitation with J.O..

[7] In April 2015, Father's mother and stepfather ("Paternal Grandparents") petitioned to be J.O.'s guardians. That same month, J.O.'s maternal great aunt and her domestic partner ("the Aunts") filed a petition to adopt J.O. in a separate proceeding. Their petition alleged that Father's and Mother's consent to the adoption was not required pursuant to INDIANA CODE § 31-19-9-8. At a hearing later that month, the trial court consolidated the CHINS, the guardianship, and the adoption proceedings. In July 2015, the State charged Father with intimidation, criminal mischief, and arson involving Paternal Grandparents' house.

[8] During the pendency of the proceedings, in June 2016, DCS filed a petition to terminate Mother's and Father's parental rights. In November 2016, the trial court held a hearing in the adoption and termination proceedings. Following

the hearing, the trial court concluded that Father's consent to the adoption was irrevocably implied. The trial court issued an order granting the Aunts' petition to adopt J.O., effectively closing the CHINS, guardianship, and termination proceedings. Father appealed, and, in November 2017, this Court reversed the trial court after concluding that the trial court had erred in concluding that Father's consent to the adoption was irrevocably implied. *In the Matter of Adoption of J.R.O.*, 87 N.E.3d 37, 43 (Ind. Ct. App. 2017), *trans. denied*.

[9] Shortly after this Court reversed the adoption, Father punched his mother in the face while children were in the home. The State charged Father with resisting law enforcement, domestic battery, and domestic battery committed in the presence of a child less than sixteen years old. The following month, at the request of his mother and with the State's approval, Father was admitted to a long-term, faith-based treatment program in Texas. The State agreed to dismiss the charges against Father if he successfully completed the program.

[10] In July 2018, DCS filed a second petition to terminate Father's parental rights. Testimony at the October 2018 termination hearing revealed that Father had just completed the Rise Discipleship Program in Abilene, Texas, and that, in two years, he would be in a position to return to Indiana from Texas to start his own ministry. Father explained that he would raise the money that he needed to start the ministry through fundraisers. Father suggested that J.O. could live with Paternal Grandparents until Father returned to Indiana. Father further testified that he had not had any contact with J.O. in two years.

[11]  DCS Family Case Manager Jodi Straus ("Case Manager Straus") testified that she had been J.O.'s case manager for four years. According to Case Manager Straus, J.O. had been removed from the home because of domestic violence between Mother and Father. However, additional issues, such as Father's violent criminal history, manifested themselves during the CHINS case. When asked if she had any current concerns regarding Father and his use of illegal substances, Case Manager Straus explained as follows: "I have concerns since I haven't had recent contact with him and I have not received any records from Abilene, Texas so I don't really know what kind of treatment he's going through at this time. He is also not drug screened for us." (Tr. at 76). The case manager further explained that she had not received a drug screen from Father in two years. In addition, Case Manager Straus was not able to say that Father could provide J.O. with suitable housing, stability, or an environment free of violence and crime. Nor was she able to say that Father had a steady source of income for J.O.'s necessities. She further testified that termination was in J.O.'s best interests. The plan for J.O. was adoption by the Aunts. According to Case Manager Straus, the Aunts had provided six-year-old J.O. with a stable loving home for the past three years. The case manager also testified that J.O. was bonded with the Aunts and other children in their family and that it would be detrimental to remove him from that home. Court Appointed Special Advocate Deborah Gamache ("CASA Gamache") also testified that termination was in J.O.'s best interests.

Following the hearing, in December 2018, the trial court issued a detailed thirteen-page order terminating Father's parental relationship with J.O. In the order, the trial court concluded as follows: "There is a reasonable probability that . . . [t]he conditions which resulted in [J.O.'s] removal or in [J.O.'s] continued placement outside the home will not be remedied as the father cannot take the child at the present time." (Tr. Vol. 2 at 25). Father appeals.

## Decision

Father contends that there is insufficient evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.,* 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id.*

A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.,* 989 N.E.2d at 1231.

[15] Here, Father first contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in J.O.'s removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to J.O.'s well-being.

[16] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in J.O.'s removal or the reasons for his placement outside the home will not be remedied.

[17]     When making a determination as to whether there is a reasonable probability that the conditions that resulted in a child's removal or continued placement outside the home will not be remedied, a trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013). The trial court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* Habitual conduct may include a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *Id.* The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* DCS is not required to provide evidence ruling out all possibilities of change. *Id.* Rather, it need only establish a reasonable probability that the parent's behavior will not change. *Id*

[18]     Here, our review of the evidence reveals that during the four-year pendency of the proceedings, Father was in and out of jail and treatment programs. At no time during the proceedings was Father able to provide stability, supervision, or housing for his son. At the time of the termination hearing, Father, who had not seen his son in two years, told the trial court that he would not be in a position to provide stability, supervision, or housing to his son for two additional years. Father explained that he needed the additional time to raise money necessary to start his own ministry in Indiana. This evidence supports

the trial court's conclusion that there was a reasonable probability that the reasons for J.O.'s placement outside the home would not be remedied. We find no error.

[19] Father also argues that there is insufficient evidence that the termination was in J.O.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. In addition, a child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[20] Here, our review of the evidence reveals that at the time of the termination hearing, J.O. had been living in a stable and loving home with the Aunts for three years. Case Manager Straus testified that J.O. was bonded with the Aunts and the other children in their family and that it would be detrimental to

remove him from that home. She further testified that termination was in J.O.'s best interests. CASA Gamache also testified that termination was in J.O.'s best interests. The testimony of these service providers, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in J.O.'s best interests.

[21] We reverse a termination of parental rights "only upon a showing of 'clear error' - that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[22] Affirmed.

Riley, J., and Bailey, J., concur.